IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHRISTOPHER M. EQUITZ,

          OPINION AND ORDER

      Plaintiff,

          17-cv-906-bbc

    v.

DOUGLAS G. PERCY, JASON A. SCHAITEL,
NICHOLAS R. JOHNSON, JASON R. DURKIN
and MICHAEL W. VANDENBROOK,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Christopher M. Equitz, who is represented by counsel, is proceeding on a claim that staff at Oakhill Correctional Institution violated his rights under the Eighth Amendment by failing to protect him from an assault by his cellmate. Now before the court is defendants' motion for summary judgment. Dkt. #12. Because I conclude that plaintiff has failed to submit evidence showing that defendants were aware of any substantial or imminent threats to plaintiff's safety, I will grant the motion.

      Turning to the parties' proposed findings of fact, I note that plaintiff failed to comply with this court's summary judgment procedures by filing separate documents responding to defendants' proposed findings of fact and proposing any additional facts. Instead, plaintiff filed a response brief in which he identified several factual disputes. After realizing his error, plaintiff filed separate documents responding to defendants' proposed findings of fact and proposing additional facts, as well as a motion asking the court to consider his untimely

1

filings. Dkt. #24. Plaintiff's counsel states that since this case was removed to federal court, he has had difficulty researching this court's procedures. Although counsel's explanation for his untimely filing is not particularly persuasive, I will consider his untimely filings because they do not prejudice defendants or affect the outcome of defendants' motion. Accordingly, from the parties' proposed findings of facts and responses, I find the following facts to be material and undisputed unless otherwise noted.

UNDISPUTED FACTS

At all times relevant to this case, plaintiff Christopher Equitz was a prisoner in the custody of the Wisconsin Department of Corrections and housed at the Oakhill Correctional Institution, at which all defendants were employed. Douglas Percy was the warden; Jason Durkin was a correctional officer; Nicholas Johnson was a lieutenant; Jason Schaitel was a sergeant; and Michael VandenBrook was a psychological associate.

Housing units at Oakhill are called "cottages." Each cottage has several rooms where inmates are assigned to live. Plaintiff arrived at Oakhill on July 8, 2015, and on July 28, 2015, he was moved to Cottage 1. His roommates were Mike Hamberlin and Dennis Steele.

In August 2015, plaintiff and two other inmates housed in Cottage 1 were disciplined for making "hooch" (converting liquid to alcohol) in the room adjacent to plaintiff's room. Neither Hamberlin nor Steele was involved in making the hootch. Some inmates in Cottage 1 suggested that someone had "snitched" on plaintiff and the others involved. Plaintiff was punished with 16 days of segregation for the incident but, because of his good behavior in

2

segregation, he served only eight days.

Plaintiff was released from segregation on September 2, 2015, and he moved back into his previously-assigned room in Cottage 1. Defendant Schaitel was the second shift sergeant responsible for Cottage 1 and the segregation unit at the time. On September 2, plaintiff asked Schaitel if he could be moved to a different cottage. Plaintiff told Schaitel that he was worried other inmates had snitched on him or that other inmates were spreading a rumor that he was released from segregation early for snitching on others. Plaintiff did not identify any specific inmates who were spreading a rumor that plaintiff was a snitch and did not say that he had received any specific threats. At his deposition, plaintiff testified that he asked Schaitel if he could be moved because:

> I knew I was going home soon [and] didn't want to have any more issues. . ., problems, and possibly stay in there, and I kind of wanted to change my ways, and I didn't -- I just didn't want to fight. I didn't want any problems. I just wanted to go home soon.

Plt.'s Dep., dkt. #8, at 84.

Defendant Schaitel believed that plaintiff was upset and emotional and that a move to a different cottage would be good for him, but Schaitel did not believe plaintiff was in any immediate danger of physical harm. Schaitel did not have authority to move plaintiff to another cottage without approval from a supervisor. On September 2, the same day plaintiff spoke with him, Schaitel sent an email to defendant Johnson, who was the second shift lieutenant at the time, stating:

> I/M Equitz Christopher #585784 was placed in TLU [temporary lockup] on 8/24 from C-l for making hooch. Today he was let out of RSHU and returned to C-l. There seems to be some tension with I/M Equitz and the others that were involved as he

3

feels he was set up and snitched on. I feel it would be in the best interest to move I/M Equitz to another unit to avoid possible problems. Is there anything I should do to get this done?
Thanks,
Schaitel

After reviewing Schaitel's email, Johnson did not consider the request to move plaintiff to be an emergency because there was no specific threat to plaintiff. Johnson called Schaitel and asked whether plaintiff would provide more specific information about any threats or inmates with whom there was tension. Schaitel told Johnson that plaintiff would not provide any more information. Although Johnson did not believe plaintiff was in immediate danger, Johnson approved Schaitel's request to move plaintiff. Johnson directed Schaitel to arrange the move with the "movement officer," Officer Durkin.

Defendant Schaitel sent an e-mail to defendant Durkin the next day, on September 3, 2015, stating:

> I/M Equitz Christopher #585784 was found making hooch in Cottage #1 last week. He was in Seg for 8 days and returned to C-l. There has been issues with other inmates on the unit since his return. Lt. Johnson approved that he be moved to another unit that isn't a white lanyard cottage.
> Thanks, Schaitel.

Officer Durkin was the control officer for Oakhill in 2015, and his duties included monitoring and setting up the movement of inmates between cottages at the facility. Durkin did not approve moves, he just set them up. To set up an inmate move, Durkin used a computer program to indicate a change in bed or cell assignments for an inmate and then called the unit sergeant, who would physically execute the move. The unit sergeant would effectuate the move and then update the computer system to show that the move had

4

occurred.

Defendant Durkin does not recall receiving the email from defendant Schaitel. An internal investigation determined that Durkin had "overlooked the email" and perhaps never read it at all. Durkin testified at his deposition that if he had reviewed the email, he probably would not have set up plaintiff's move without receiving a confirmation from defendant Johnson that the move had been approved. At the time, Durkin believed sergeants had to provide something, besides their own say so, that a lieutenant had approved an inmate move. Either because he never reviewed the email or because he was waiting for confirmation from Johnson, Durkin did not set up plaintiff's move from Cottage 1. Durkin also did not contact Johnson or Schaitel to determine whether Johnson had actually approved the move.

Meanwhile, plaintiff was not getting along well with one of his roommates, Hamberlin. After plaintiff had returned to his room from his eight-day stay in segregation, plaintiff realized that Hamberlin had taken "control" of the room. Hamberlin had begun bullying plaintiff and the other roommate, Steele, by doing such things as refusing to turn down the television when plaintiff was trying to sleep, leaving his property everywhere and controlling when the window was open. Before his stay in segregation, plaintiff had gotten along fine with Hamberlin, though Hamberlin had threatened to beat up Steele in the past. Plaintiff never told Schaitel or any of the other defendants about Hamberlin's prior threats to Steele, and none of the defendants were aware of any history of aggression or violence by Hamberlin toward other inmates.

5

At some point, plaintiff says he spoke to defendant Schaitel about Hamberlin's behavior. (Schaitel does not recall plaintiff speaking to him about Hamberlin in particular, but I must assume for purposes of summary judgment that plaintiff's version of events is true.) Plaintiff does not recall when in particular he first spoke to Schaitel. (Plaintiff testified that he did not believe anything happened between him and Hamberlin on September 2, the day Schaitel requested a move on plaintiff's behalf, that he raised with Schaitel. Plt.'s Dep., dkt. #8, at 27.) Plaintiff remembers that at some point after September 2, he approached Schaitel, in tears, about Hamberlin's behavior. Plaintiff says he told Schaitel that Hamberlin was "bullying the room" and "pushing his weight around." Plaintiff also told Schaitel that Hamberlin was making "demands" on plaintiff and their other roommate relating to use of the television set and keeping the window open or closed. Plaintiff did not tell Schaitel that Hamberlin was one of the roommates spreading the rumor that he was a snitch. (Plaintiff says that he may have later told an internal investigator that Hamberlin called plaintiff a "snitch," but he has adduced no evidence that he told this to Schaitel or any of the other defendants.) Plaintiff also did not tell Schaitel that Hamberlin had threatened him with violence or that he believed Hamberlin posed a danger to him.

On September 4 and 8, 2015, plaintiff saw Dr. VandenBrook for psychology appointments. Plaintiff told VandenBrook that he was having tension with his roommates, but he did not tell VandenBrook about any specific threats he had received. (Plaintiff believes he might have told VandenBrook that Hamberlin had threatened him and his roommate, but does not recall when he said this to VandenBrook. Plt.'s Dep., dkt. #8, at

6

25.) Plaintiff also asked VandenBrook if he could check on the status of plaintiff's request to change rooms. On September 9, VandenBrook emailed defendant Johnson, stating:

> Equitz is meeting with me, and asked if I would check with you to see if his 2nd shift sgt requested a move to another unit. He is still on Unit 1. Thanks, Mike.

Johnson replied to VandenBrook stating that Schaitel "was instructed to arrange a move through the movement officer." Johnson did not call Durkin or Schaitel to check on the status of plaintiff's transfer. Plaintiff did not see VandenBrook again between September 9, 2015 and November 18, 2015.

In the meantime, plaintiff continued to ask Schaitel about his transfer. Plaintiff also says that he continued to talk to Schaitel on a daily or weekly basis about Hamberlin's behavior, the "situation in the room" and how he wished he could be moved. (Schaitel does not recall plaintiff talking to him about Hamberlin at any time.)

Sometime in October 2015, plaintiff injured his shoulder while exercising and was moved to a lower bunk. On October 14, 2015, defendant Schaitel emailed defendant Durkin stating, "Just wanted to remind you I/M Equitz #585784 is now on a low bunk restriction." Durkin then updated plaintiff's move to a lower bunk in the computer system. Plaintiff does not recall making further inquiries of any prison staff about changing rooms after he was moved to a lower bunk. Plaintiff eventually gave up on being moved to a different unit and stopped asking Schaitel about it.

On November 18, 2015, plaintiff and Hamberlin were involved in a physical altercation. Hamberlin entered the room when plaintiff was watching television and Hamberlin opened the window. Plaintiff closed the window, and Hamberlin opened it again.

7

Hamberlin then stood in front of the window to block plaintiff's path to it. Plaintiff asked Hamberlin why he was "acting like a bitch." Hamberlin then attacked plaintiff, knocking him unconscious. Plaintiff was later transported to the hospital for treatment, where he received a diagnosis of a concussion with loss of consciousness.

OPINION

Plaintiff contends that defendants Schaitel, Johnson, Durkin and VandenBrook violated his Eighth Amendment rights by failing to protect him from being assaulted by his cellmate. (Plaintiff concedes that his claim against Warden Percy should be dismissed for Percy's lack of personal involvement.) Under the Eighth Amendment, prison officials have a duty "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994) (internal quotation omitted). See also Gevas v. McLaughlin, 798 F.3d 475, 480 (7th Cir. 2015); Brown v. Budz, 398 F.3d 904, 909 (7th Cir. 2005). A prisoner can prevail on a claim that a prison official failed to protect him by showing that the official showed "deliberate indifference" to a "substantial risk of serious harm" to the inmate. Farmer, 511 U.S. at 837. That is, the prisoner must show that the defendant was subjectively aware of, but disregarded, a serious risk of attack. Dale v. Poston, 548 F.3d 563, 569 (7th Cir. 2008).

A prisoner generally proves that a prisoner official had "knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." Gevas, 798 F.3d at 480 (citations omitted). "Complaints that convey only a generalized,

8

vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." Id. See, e.g., Dale, 548 F.3d at 569 ("[The prisoner's] vague statement that inmates were 'pressuring' him and 'asking questions' were simply inadequate to alert the officers to the fact that there was a true threat at play."); Klebanowski v. Sheahan, 540 F.3d 633, 639–40 (7th Cir. 2008) (beyond expressing fear for his life, prisoner's statements to guards did not identify who was threatening him or what threats were); Grieveson v. Anderson, 538 F.3d 763, 776 (7th Cir. 2008) (prisoner told officials "he was afraid and wanted to be moved," but "did not tell the officers who assaulted him, why he had been assaulted . . . or whether he continued to feel threatened by the assaulting individuals"); Butera v. Cottey, 285 F.3d 601, 606 (7th Cir. 2002) (prisoner only stated vaguely that he was "scared," was "having problems" in his cellblock and "needed to be removed"). "By contrast, a complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." Gevas, 798 F.3d at 481 (citing Haley v. Gross, 86 F.3d 630, 643 (7th Cir. 1996) (prisoner advised sergeant that cellmate was intimidating him, acting strangely, had threatened that "something crucial was going to happen" if one of them was not moved and was now "deadlocked" in cell, which restricted ingress to and egress from cell)).

In this case, defendants contend that plaintiff's Eighth Amendment claim must fail because he cannot prove he faced a substantial risk of serious harm from Hamberlin, that

9

any of the defendants were subjectively aware of any specific, credible or imminent risk of harm to plaintiff or that any defendant acted with deliberate indifference. After reviewing the evidence relating to each defendant's knowledge, I agree with defendants that plaintiff cannot prove that any defendant knew there was a substantial risk of serious harm to plaintiff. Therefore, I need not address all of defendants' remaining arguments.

According to plaintiff's version of events, defendant Schaitel had the most direct knowledge of any potential risk of harm to plaintiff. Schaitel was in Cottage 1 on a daily basis and plaintiff says he spoke repeatedly with Schaitel about tension on the unit after his release from segregation and Hamberlin's bullying of plaintiff and inmate Steele. However, even under plaintiff's version of events, plaintiff's statements to Schaitel were too vague to put Schaitel on notice of a specific and substantial risk of injury. In particular, plaintiff concedes he never told Schaitel that he believed he might be attacked by another inmate or that he had received any threats of physical harm from Hamberlin or any other inmate. Plaintiff told Schaitel only that he was worried other inmates had "snitched" on him or that other inmates were spreading a rumor that he was released from segregation early for "snitching" on others and that Hamberlin was bullying the room. These are the type of vague statements that the court of appeals has concluded are insufficient to provide notice of a specific or substantial risk of serious harm. Compare Butera, 285 F.3d at 606 (prisoner's statements that he was "scared," was "having problems" in his cellblock and "needed to be removed" not sufficient to give notice to defendants of specific threat of harm); with Gevas, 798 F.3d at 481 (inmate told defendants that cellmate "had threatened

10

to stab him . . . accused him of snitching on his prior cellmate and 'constantly talks about his gang and stabbing me'").

Additionally, "[j]ust because a correctional officer knows an inmate has been branded a snitch–and it's common knowledge that snitches face unique risks in prison–does not mean that an officer violates the Constitution if the inmate gets attacked." Dale, 548 F.3d at 570. "Each case must be examined individually, with particular focus on what the officer knew and how he responded." Id. In this instance, plaintiff did not tell Schaitel that any specific inmate had called him a snitch or that he had received any specific threats, and Schaitel had not seen evidence that inmates had actually labeled plaintiff as a snitch. Plaintiff even concedes that he asked Schaitel to move him because he did "wanted to change [his] ways" and did not want any problems, Plt.'s Dep., dkt. #8, at 84, and not because he had received any specific threats. Thus, although Schaitel thought plaintiff would benefit from a transfer for his emotional wellbeing, he concluded reasonably that plaintiff did not need a transfer for his immediate safety. Accordingly, the undisputed facts show that Schaitel did not have notice of a specific and substantial risk of injury to plaintiff sufficient to support an Eighth Amendment claim against him.

Defendants Johnson and Durkin's knowledge of any risk to plaintiff came solely from information they learned from defendant Schaitel. From Schaitel's September 2 email, Johnson knew that plaintiff had been released from segregation and there seemed to be "some tension" between plaintiff and others involved in the hootch-making incident because plaintiff felt "he was set up and snitched on." Johnson also knew that plaintiff had not

11

provided any details regarding any specific threats, but that Schaitel thought it would be "in the best interest to move [plaintiff] to another unit to avoid possible problems." Cf. Dale, 548 F.3d at 570 (although defendant officers "all implored [plaintiff] for details" of threat to his safety, he provided none). Thus, the only information Johnson had was that plaintiff was concerned about snitching and there was some "tension" with unidentified inmates. Thus, although Johnson approved plaintiff's request to be moved, the brief email from Schaitel did not place Johnson on notice that plaintiff faced a substantial risk of serious harm requiring his immediate transfer from Cottage 1. Therefore, Johnson is entitled to summary judgment as well.

As for defendant Durkin, it appears that he may have acted negligently by failing to read the email from Schaitel regarding plaintiff's move or by failing to contact Schaitel or Johnson for more information. However, whether Durkin erred in fulfilling his obligations as movement officer is not determinative of whether he is liable to plaintiff under the Eighth Amendment. Like Johnson, Durkin's only knowledge came from Schaitel. Schaitel stated in an email that Johnson had approved a move of plaintiff because "[t]here has been issues with other inmates on the unit" since his return from segregation. This email contained no specific information that would have led Durkin to believe that plaintiff faced a substantial or imminent risk of serious harm and needed to be moved immediately. Plaintiff's claim against Durkin fails.

This leaves defendant VandenBrook. Plaintiff says he saw VandenBrook on September 4 and 8, 2015, and reported that he was having tension with his roommates. He

asked VandenBrook if he could check on the status of his room change. Plaintiff also says he may have told VandenBrook that Hamberlin had threatened him and Steele, but he cannot remember any details about what he told VandenBrook, and he concedes he did not tell VandenBrook that he was in any imminent danger of serious harm from Hamberlin or any other inmate. VandenBrook contacted Johnson about the room change, and Johnson responded that Schaitel had been directed to contact Durkin about it. Plaintiff has adduced no evidence suggesting that VandenBrook had an obligation under the Eighth Amendment to do more based on the vague concerns plaintiff had about his roommates. Therefore, VandenBrook is entitled to summary judgment on plaintiff's claims as well.

## ORDER

IT IS ORDERED that

1. Plaintiff Christopher Equitz's motion for extension of time to file proposed findings of fact and responses, dkt. #24, is GRANTED.

2. Defendants' motion for summary judgment, dkt. #12, is GRANTED.

3. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 10th day of January, 2019.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge